COMMONWEALTH *vs.* MICHAEL DeCOTIS & another.

Essex.    May 8, 1974. — September 12, 1974.

Present: TAURO, C.J., REARDON, KAPLAN, & WILKINS, JJ.

*Mobile Home.   Equity Jurisdiction,* Consumer protection.  *Consumer Protection Act.   Restitution.   Equity Pleading and Practice,* Decree, Parties. *Words,* "Trade," "Commerce."

Leasing of lots for mobile homes in a mobile home park is "trade" or "commerce" so as to make applicable the provisions of G. L. c. 93A making unlawful certain unfair or deceptive acts or practices "in the conduct of any trade or commerce." [238-239]

Imposition by the proprietors of a mobile home park of a fee for a tenant's sale of a mobile home on one of the lots to a new owner was not within the exemption of § 3 of c. 93A for "transactions or actions otherwise permitted under laws as administered by any regulatory board" where the proprietors did not show that under laws as administered by the local board of health their resale fee practice was permitted. [239-240]

Collection by the proprietors of a mobile home park of substantial fees upon resale of homes by tenants constituted an unfair act or practice within G. L. c. 93A, § 2 (a), so as to make proper restitution and injunctive relief in a suit by the Attorney General in the name of the Commonwealth where the proprietors rendered no services for such fees and the nature and location of the homes and the financial circumstances of the tenants gave them little choice but to pay the fees, even if no deception of the tenants was involved. [240-243]

The provisions of G. L. c. 93A, even as originally enacted prior to the merely clarifying procedural amendment of § 4 by St. 1969, c. 814, § 3, granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of, including the power to order the proprietors of a mobile home park to make restitution to former occupants whom the proprietors had wrongfully charged a resale fee; to require that such refunds be placed in escrow; to provide that unpaid refunds escheat to the Commonwealth; and to place on the proprietors the expense of finding the persons entitled to refunds. [243-244]

In a suit in equity by the Attorney General in the name of the Commonwealth seeking relief under G. L. c. 93A with respect to improper charges made by the proprietors of a mobile home park to

former occupants of the park upon resale of their homes, the relief granted was not to be confined to such persons listed in the bill but should be in favor of all such persons. [244-246]  ·
A provision of the decree in a suit in equity under G. L. c. 93A by the Attorney General in the name of the Commonwealth against the proprietors of a mobile home park directing them to permit a purchaser of a home in the park to become a tenant on the same terms as those applicable to the seller of that home was overbroad and should be modified to refer to the terms and conditions of tenancy generally available from time to time to tenants of the park. [246]
In view of the allegations and a prayer for general relief in the bill in a suit in equity under G. L. c. 93A by the Attorney General in the name of the Commonwealth against the proprietors of a mobile home park, there was no merit in a contention by the defendants that the final decree went beyond the prayers of the bill. [246-247]

BILL IN EQUITY filed in the Superior Court on August 12, 1971.

The suit was heard by *Good, J.*

*James T. Ronan* for the defendants.

*Sarah L. Wasserman,* Assistant Attorney General, for the Commonwealth.

WILKINS, J.   In August, 1971, the Attorney General in the name of the Commonwealth filed a bill in equity under the authority of G. L. c. 93A, § 4, against the defendants who were alleged to be engaged in the business of renting lots for mobile homes and managing a mobile home park in Peabody under the name of Pine Grove Mobile Park (Pine Grove). The bill sought, with other relief, an injunction prohibiting the defendants from imposing any fee on occupants of mobile homes in Pine Grove on the resale of those mobile homes. The Attorney General also sought an order for restitution of certain resale fees paid to the defendants by persons who had sold mobile homes in Pine Grove.[1]

The defendants appeal from a final decree which enjoined them from requiring or receiving any resale fee

---

[1] The applicable prayer sought restitution of resale fees only when the fact of such fee was not disclosed "prior to the purchase of the mobile home" by the defendants' tenant. As appears below, the final decree ordered restitution of all resale fees.

except for reasonable services rendered at the request of the seller of a mobile home. The decree also enjoined them from imposing certain restrictions on the resale of mobile homes in Pine Grove[2] and required the defendants to repay with interest all resale fees received since 1965. That decree further imposed an affirmative obligation on the defendants to pay costs incurred in ascertaining the whereabouts of persons who had paid resale fees and required that any funds which could not be repaid be placed in an escrow account for one year and, if not claimed within that year, be paid to the Commonwealth.[3]

The case was tried in March, 1972. The judge voluntarily filed a report of findings in December, 1972, which the parties have treated as a statutory report of material facts. G. L. c. 214, § 23. The evidence is reported. In this circumstance the findings of fact made by the judge must stand unless they are plainly wrong, and we may find facts not expressly found by the judge. *All Stainless, Inc.* v. *Colby,* 364 Mass. 773, 776 (1974), and cases cited. There was ample support in the evidence for the findings made by the judge.

We set forth the following facts found by the judge or by

---

[2] Paragraph 2 of the decree reads as follows: "The respondents are permanently enjoined from prohibiting, limiting or restricting the resale of mobile homes in Pine Grove Park by persons living in the park or placing any restraint upon a free and open sale of mobile homes located in the park for occupancy there by the purchaser upon the same terms and conditions of tenancy as those of said seller, subject only to the reasonable approval of said buyer by the Respondents."

[3] Paragraphs 5 and 6 of the decree, concerning the escrow fund and the obligation to pay the cost of seeking out persons who had paid resale fees, respectively read as follows: "5. The Respondents shall place in an escrow fund to be held by the Commonwealth all resale fees plus interest owing to those persons who have not been located during the thirty day period following the filing of the final decree, to be held for a period of one year commencing with the final disposition of this action on appeal, and at the expiration of that time, all funds remaining in the escrow account shall be paid to the Commonwealth. 6. The Petitioners shall make a diligent effort to ascertain the whereabouts of persons who have paid resale fees by any reasonable means, including publication in newspapers with distribution in the area of Pine Grove Park and in metropolitan Boston. The reasonable costs of locating persons who have paid resale fees shall be borne by the Respondents."

The reference in the first sentence of paragraph 6 to the "Petitioners" is an error. There is only one "petitioner." It does, however, appear to have been intended that the decree place the burden on the Commonwealth to take diligent steps to locate the defendants' former tenants.

us. The defendants are engaged in the business of renting lots in Pine Grove on which mobile homes are placed by their owners. Since 1970 the defendants have also been in the business of selling mobile homes. A mobile home owner who becomes a tenant of the defendants is subjected to the terms of a rental agreement. The first form of rental agreement used by the defendants made no reference to any obligation of the tenant to pay a fee to the defendants on the sale of his mobile home. From September, 1969, to about May, 1970, the defendants used a form of rental agreement which stated that mobile homes must be removed on resale although "exceptions might be made if a mobile home is sold to respectable adults with no children or pets." The agreement stated further that "[t]he management must interview the new tenant before accepting a deposit" and added "[f]or this concession and service rendered there will be a $250 service charge to the seller." A third form of agreement, adopted about May, 1970, changed the service charge to ten per cent of the selling price. It is clear that some tenants did not receive rental agreements prior to committing themselves to the installation of their mobile homes in Pine Grove and that some tenants did not learn of the practice of imposing a resale fee until long after they had moved into Pine Grove.

The Attorney General asserts that the imposition and collection of the so called "service charge" or resale fee is an unfair and deceptive trade practice under G. L. c. 93A. Although the final decree directs the repayment of any resale fee paid since 1965, the first resale fee was collected by the defendants in October of 1968. Eighteen people paid a resale fee of $250, and twenty-one paid a resale fee of ten per cent of the sale price, an amount which was generally larger than $250. One fee was $1,200. In these instances no services were rendered by the defendants in connection with the sale, although the prospective purchaser was interviewed and approved as a new tenant by the defendants or their representative. The judge found that the fee, unrelated to services rendered or the length of tenancy, was arbitrary.

Many of the prospective tenants are retired or near retirement age, living on fixed incomes. Once a mobile home has lost a substantial portion of its mobility by its placement on a foundation with utility connections and associated landscaping, the expense of moving the home for the purposes of sale are substantial in relation to its market value. The market value of such a home in place is significantly greater than its market value as a mobile home to be moved. Finding a nearby location acceptable under local zoning regulations presents significant problems to a person seeking to move a mobile home from Pine Grove. Few mobile homes have been moved from Pine Grove.

Chapter 93A, which was inserted by St. 1967, c. 813, § 1, is designated as the "Regulation of Business Practice and Consumer Protection Act." St. 1967, c. 813, § 2. This act is one of several legislative attempts in recent years to regulate business activities with the view to providing proper disclosure of information and a more equitable balance in the relationship of consumers to persons conducting business activities. See, e.g., G. L. c. 140C, inserted by St. 1969, c. 517 § 1 (consumer credit cost disclosure); G. L. c. 255D, inserted by St. 1966, c. 284, § 1 (retail instalment sales act); G. L. c. 140, § 32J, as appearing in St. 1973, c. 1007, § 1, and §§ 32L-32Q, inserted by St. 1973, c. 1007, § 2 (regulating the operation of mobile home parks).

1. The defendants first argue that G. L. c. 93A does not apply to their activities occurring during the period dealt with at trial because they were not engaged in "any trade or commerce" as defined in G. L. c. 93A, § 1, as then amended. The unfair or deceptive acts or practices which are declared unlawful by G. L. c. 93A, § 2 (a), are acts or practices "in the conduct of any trade or commerce." As initially enacted, and until an amendment in 1972 (see St. 1972, c. 123), "trade" or "commerce" was defined in G. L. c. 93A, § 1, to "include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . and shall include any trade or commerce directly or indirectly affect-

ing the people of this commonwealth." See St. 1967, c. 813,
§ 1.

The statutory definition of "trade" and "commerce"
recites certain activities which are included within those
terms and concludes by incorporating within the statutory
words "any trade or commerce directly or indirectly affect-
ing the people of this commonwealth." Clearly the leasing
of lots for mobile homes is a "trade" or "commerce." A wide
range of activities has been included within the word
"commerce" as used in § 5 (a) (1) of the Federal Trade
Commission Act. See, e.g., *Branch* v. *Federal Trade
Commn.* 141 F. 2d 31, 34 (7th Cir. 1944) (correspondence
school); *United States Retail Credit Assn. Inc.* v. *Federal
Trade Commn.* 300 F. 2d 212 (4th Cir. 1962) (collection
agency). General Laws c. 93A, § 2 (b), states that "[i]t is the
intent of the legislature that in construing paragraph (a) of
this section the courts will be guided by the interpretations
given by the Federal Trade Commission and the Federal
Courts to § 5 (a) (1) of the Federal Trade Commission Act
(15 U. S. C. § 45 [a] [1] [1970]), as from time to time
amended."[4] The 1972 amendment to the definition of trade
or commerce, adding express reference to the renting and
leasing of services or property, did not expand, but only
clarified, the scope of the words "trade" or "commerce."
St. 1972, c. 123. Cf. *Kagan* v. *United Vacuum Appliance
Corp.* 357 Mass. 680, 683 (1970).

2. The defendants next argue that their activities are
exempt transactions under § 3 of G. L. c. 93A. Section 3
states that G. L. c. 93A shall not apply, among other things,
to "transactions or actions otherwise permitted under laws
as administered by any regulatory board or officer acting
under statutory authority of the commonwealth or of the
United States." The defendants assert that the terms of
their rental agreements were subject to regulation by the

---

[4] Section 5 (a) (1) of the Federal Trade Commission Act does not use the word
"trade." It states that "[u]nfair methods of competition in commerce, and unfair
or deceptive acts or practices in commerce, are hereby declared unlawful." Just as
the Federal act regulates matters in interstate commerce, so does our State
statute seek within constitutional limits to reach all proscribed, nonexempt
transactions affecting the people of this Commonwealth.

local board of health under G. L. c. 140, §§ 32A-32L. Without intimating that the Peabody board of health had authority to regulate the financial aspects of a mobile park lease agreement, we conclude that the defendants have failed to meet their statutory burden (G. L. c. 93A, § 3 [2]) of proving the availability of the exemption. The defendants have not shown that under laws *"as administered"* by the Peabody board of health the imposition and collection of a resale fee was permitted.

3. The defendants next contend that they engaged in no deception or unfair act or practice. In light of the facts found by the judge and by us such an argument can succeed only if as matter of law their conduct was not an unfair or deceptive act or practice within the meaning of those words in G. L. c. 93A, § 2 (a).

The defendants argue that their actions were not deceptive or unfair because resale charges were uniformly collected by mobile home park operators in the Commonwealth. Such a fact was not proved and, even if it had been, the existence of an industry-wide practice would not constitute a defense to unlawful conduct. *Minter* v. *Federal Trade Commn.* 102 F. 2d 69, 70 (3d Cir. 1939). *International Art Co.* v. *Federal Trade Commn.* 109 F. 2d 393, 397 (7th Cir. 1940), cert. den. 310 U. S. 632 (1939). *P. F. Collier & Son Corp.* v. *Federal Trade Commn.* 427 F. 2d 261, 275-276 (6th Cir. 1970). See *Federal Trade Commn.* v. *Keppel & Bro. Inc.* 291 U. S. 304, 313 (1934).

The defendants contend that the Legislature has indorsed the reasonableness and fairness of their resale fee practices by a 1973 amendment to G. L. c. 140, § 32L. See St. 1973, c. 1007, § 2. That amendment provides (in part) that a mobile home park licensee may "upon the proposed sale of such a home, contract with the mobile home owner to sell the home for a fee not to exceed ten per cent of the sale price of such home." Otherwise no such licensee may "impose by any rule or condition of occupancy any fee, charge, or commission for the sale of a mobile home located in a mobile home park." See G. L. c. 140, § 32L, cl. 4, inserted by St. 1973, c. 1007, § 2. This fee authorized by

statute for selling a mobile home relates to services in selling the mobile home, not unlike those of a real estate agent. The defendants' practice of collecting a fee for no services at all clearly is not indorsed by the 1973 amendment.[5]

The closest question presented by the defendants' conduct arises in those circumstances where, before a mobile home owner committed himself in any respect, he knew that the defendants were asserting a right to resale charge. In such a situation, assuming the disclosure was full and fair, the defendants may well not have been engaged in any deceptive act or practice.[6] Although deception may not have been involved where the disclosure by the defendants to the prospective tenant was timely and complete, we believe that the practice of charging a fee for no service whatsoever was an unfair act or practice within the intent of § 2 (a) of G. L. c. 93A and that it was therefore unlawful.

Chapter 93A furnishes no definition of what constitutes an unfair act or practice made unlawful by § 2 (a). We are directed by § 2 (b) to consider interpretations of unfair acts and practices under the Federal Trade Commission Act as construed by the Commission and the Federal courts. Unfairness under the Federal act has not been limited to practices forbidden at common law or by criminal statute. *Federal Trade Commn.* v. *Motion Picture Advertising Serv. Co. Inc.* 344 U. S. 392, 394 (1953). *Federal Trade Commn.* v. *Colgate-Palmolive Co.* 380 U. S. 374, 380, 384 (1965). Cf. *P. F. Collier & Son Corp.* v. *Federal Trade*

---

[5] Arguments that no mobile home owner who sold a mobile home in Pine Grove ever received less on resale than the cost of the home to him or her, even if proved, would not prevent the defendants' conduct from being unfair. Similarly, the fact that the defendants as sellers of new mobile homes may have lost revenue from sales of new homes when used homes were sold in their park does not justify their practices as lawful.

[6] In other situations, however, the acts of the defendants certainly had an element of deception, arising from nondisclosure. Adequate disclosure was lacking where no information concerning resale fees was furnished before the tenant assumed an obligation to lease, such as (a) where the rental agreement was silent on the subject and (b) where a rental agreement disclosing the resale fee practice was not furnished until after the tenant had made a commitment to occupy a lot at Pine Grove.

*Commn.* 427 F. 2d 261, 267 (6th Cir. 1970), cert. den. 400 U. S. 926 (1970). In fact the Federal act was passed in 1914 to overcome the narrow approach of what the common law regarded as unfair competition, and in effect to permit, by the gradual process of judicial inclusion and exclusion, a new definition of what is unfair. See *Federal Trade Commn.* v. *Beech-Nut Packing Co.* 257 U. S. 441, 453 (1922); *Federal Trade Commn.* v. *R. F. Keppel & Bro. Inc.* 291 U. S. 304, 310-312 (1934). The present language of § 5 of the Federal Trade Commission Act concerning unfair or deceptive acts or practices was added in 1938. 52 Stat. 111, 15 U. S. C. § 45 (a) (1) (1970). It also contains flexible proscriptions. *Federal Trade Commn.* v. *Colgate-Palmolive Co., supra,* at 385. Judge Learned Hand stated that the duty of the Federal Trade Commission "in part at any rate, is to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop." *Federal Trade Commn.* v. *Standard Educ. Soc.* 86 F. 2d 692, 696 (2d Cir. 1936), revd. in part 302 U. S. 112 (1937).

The existence of unfair acts and practices must be determined from the circumstances of each case. We do not now undertake to establish general rules which may be applied in other situations. The nature of the statute and the development of the law under the comparable Federal statute indicate that such an attempt would be undesirable.

What we can determine is that the collection of resale charges by the defendants was an unfair act or practice. That provision of the Uniform Commercial Code which permits a court to refuse to enforce a contract or a contract provision which is unconscionable provides a reasonable analogy here. See G. L. c. 106, § 2-302. Such a comparison was made by the Supreme Court of New Jersey in *Kugler* v. *Romain,* 58 N. J. 522, 545-547 (1971), where the New Jersey Consumer Fraud Act was interpreted to permit the invalidation of consumer sales because of unconscionable prices. In the *Kugler* case, sales contracts were held to be

invalid in part because, although the purchasers received something of value, the value received was unconscionably disproportionate to the price paid. In our case the defendants furnished no goods or services in connection with the resale of mobile homes in Pine Grove. They undertook to impose an arbitrary provision on persons of limited means and limited choice for residences. The defendants were able to collect the resale fees solely because their tenants were in a position in which they had no reasonable alternative but to pay and to agree to pay. It was financially preferable to sell a mobile home on site in Pine Grove for ninety per cent of its fair market value (or for $250 less than its fair market value) than to sell that home for relocation. The willingness of tenants to pay resale fees, and even to contract knowingly to pay those fees, does not make the collection of such a fee fair. It merely demonstrates the extent to which the defendants had their tenants at their mercy.[7] The extraction of a resale fee for no services rendered in these circumstances was an unfair act or practice under G. L. c. 93A, § 2 (a).

4. The defendants argue that it would be constitutionally improper to require them to make restitution as to resale charges collected before G. L. c. 93A became effective and under rental agreements entered into prior to the effective date of G. L. c. 93A. Because on the record before us the defendants state that the first resale charge was collected in October, 1968, and the first resale provision in a rental agreement appeared in 1969, both events occurring long after the effectiveness of the prohibitions of G. L. c. 93A, no retroactive application of G. L. c. 93A seemingly is involved. Thus constitutional arguments based on substantive due process rights and impairment of

---

The defendants' claim that other mobile home park operators in Massachusetts were engaged in the same practice merely accentuates the ineffective bargaining position of a person who wished to place a mobile home on leased premises in a mobile home park in this State. It is not surprising that substantial regulatory legislation respecting the operation of mobile homes was recently enacted. See St. 1933, c. 1007.

the obligation of contracts apparently have no application here.[8]

5. The defendants raise several objections to the form and scope of the final decree. They argue that the decree is overly broad in providing for an escrow fund, portions of which may escheat to the Commonwealth (see fn. 3 above), and in requiring acceptance of purchasers of mobile homes in Pine Grove on the same terms as former tenants (see fn. 2 above). The defendants also assert that a court of equity does not have the power under G. L. c. 93A to order restitution with respect to resale fees collected prior to the amendment of § 4 of G. L. c. 93A by St. 1969, c. 814, § 3. The 1969 amendment expressly empowered courts to make such orders, in addition to injunctive relief, "as may be necessary to restore to any person who has suffered any ascertainable loss . . . [by reason of an unfair act or practice] any moneys or property" lost. The defendants argue also that only those persons who were named in the bill may recover in this proceeding and that a decree in favor of all persons who paid resale fees is not permitted. Finally, the defendants assert that the decree goes beyond the scope of the bill.

---

[8] The reference in the final decree to the repayment of resale fees since 1965 causes the defendants no harm because there were no resale fees collected, according to their own testimony, until October, 1968.

We would not concur with the Commonwealth's argument that because "the Legislature did not confer new substantive rights on consumers," G. L. c. 93A may be applied retroactively. We disagree with the claim that G. L. c. 93A "merely provided for new procedural methods of prosecution for consumer abuse" which could be applied retroactively. See *Hanscom* v. *Malden & Melrose Gas Light Co.* 220 Mass. 1, 3, 6 (1914). Although G. L. c. 93A admittedly established new procedural devices to aid consumers and others (which in this respect could constitutionally be applied retroactively), it also created new substantive rights by making conduct unlawful which was not unlawful under the common law or any prior statute. Indeed in another portion of the Attorney General's brief it is stated that the statutory words " '[u]nfair and deceptive practices' are not limited by traditional tort and contract law requirements."

If, as the Commonwealth argues, there are in fact persons who did pay resale fees prior to the effective date of G. L. c. 93A, as added by St. 1967, c. 813, § 1, the defendants may move to modify the final decree to exempt them from making any refund of a resale fee in any specific case where a named tenant did not have a right (apart from G. L. c. 93A) to a refund of the resale fee paid the defendants. In such a situation, a determination as to each such tenant's rights will be required before the motion to modify may be acted on. The final decree may provide that the court retains jurisdiction of the case for this purpose.

We believe that, as originally enacted, G. L. c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective. See *Fields* v. *Othon,* 313 Mass. 115, 118 (1943); *Nigro* v. *Conti,* 319 Mass. 480, 484 (1946); *Porter* v. *Warner Holding Co.* 328 U. S. 395, 399 (1946); *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.* 402 U. S. 1, 15 (1971). This traditional power includes the right to require that funds be placed in escrow, *Securities & Exchange Commn.* v. *Texas Gulf Sulphur Co.* 312 F. Supp. 77, 90-94 (S. D. N. Y. 1970), affd. in part and revd. in part 446 F. 2d 1301 (2d Cir. 1971), cert. den. 404 U. S. 1005 (1971); *West Va.* v. *Chas. Pfizer & Co. Inc.* 314 F. Supp. 710 (S. D. N. Y. 1970), affd. 440 F. 2d 1079 (2d Cir. 1971), cert. den. sub nom. *Cotler Drugs, Inc.* v. *Chas. Pfizer & Co. Inc.* 404 U. S. 871 (1971), and escheat to the State when the rightful owner or owners cannot be found, *West Va.* v. *Chas. Pfizer & Co. Inc., supra,* and includes the right to place on the wrongdoer the expense of finding persons entitled to funds. See Pomeroy, Eq. Jur. (5th ed.) §§ 115-116 (1941). We view the 1969 amendment to § 4 of G. L. c. 93A as clarifying the authority of the court, but not increasing it. In any event the amendment constituted a change which was procedural, and not substantive, and may consequently be applied retroactively to furnish a means of providing relief to persons who had claims because of unfair practices under G. L. c. 93A. *Selectmen of Amesbury* v. *Citizens Elec. St. Ry.* 199 Mass. 394, 395 (1908). *Smith* v. *Freedman,* 268 Mass. 38 (1929). *Berkwitz, petitioner,* 323 Mass. 41, 47 (1948). *Welch* v. *Mayor of Taunton,* 343 Mass. 485 (1962). For all these reasons the defendants' objections to the escrow fund and to the ordering of relief in the form of restitution must be rejected.

We believe further that relief under G. L. c. 93A is not intended to be limited in a proceeding under § 4 to those persons who are listed in the Attorney General's bill. The very purpose of the Attorney General's involvement is to provide an efficient, inexpensive, prompt and broad solution to the alleged wrong. Relief in favor of all wronged

persons would be the result in a class action brought by a consumer under G. L. c. 93A, § 9, and we see no logical reason for a distinction in an action brought by the Attorney General under § 4. Under similar statutory authority, the Supreme Court of New Jersey has held that the Attorney General of that State is entitled to bring a suit not only on behalf of specially named persons but also on behalf of all similarly situated persons. *Kugler* v. *Romain,* 58 N. J. 522, 538 (1971). See *Kugler* v. *Koscot Interplanetary, Inc.* 120 N. J. Super. 216, 259 (1972). Cf. *Porter* v. *Warner Holding Co.* 328 U. S. 395, 398-399 (1946).

We turn next to the form of paragraph 2 of the decree, which in effect directs the defendants to permit each purchaser of a home in Pine Grove to become a tenant on the same terms as those applicable to the seller of that home. See fn. 2 above. This provision appears to restrict the defendants to the collection of the same rent and to the other terms of the tenancy of the former occupant. Such a decree seems overbroad. We believe that the second paragraph of the final decree should be modified to refer to the same terms and conditions of tenancy as those generally available from time to time to tenants of Pine Grove.[9]

Finally, we deal with the defendants' claim that the relief granted exceeds the scope of the bill. The objection that the decree goes beyond the prayers of the bill is without merit. Relief is based on the allegations of a bill, and not on its prayers. *North Easton Co-op. Bank* v. *MacLean,* 300 Mass. 285, 295 (1938). *Bleck* v. *East Boston Co.* 302 Mass. 127, 130 (1939). *Seder* v. *Kozlowski,* 304 Mass. 367, 369 (1939). Moreover, the bill contained a prayer for general relief, which would support any relief consistent with the nature of the case. *Alden Bros. Co.* v. *Dunn,* 264 Mass. 355, 363 (1928). *Cooperstein* v. *Bogas,* 317 Mass. 341 (1944). The bill not only alleges deceptive acts in connection with the late furnishing of, and in the changing of the terms of, rental

---

[9] The language of paragraph 2 of the final decree, quoted in fn. 2 above, should be revised by striking the words "of said seller" and substituting therefor the words "generally available from time to time to tenants of Pine Grove."

agreements, but also alleges that the exacting and the attempt to exact resale fees are violations of G. L. c. 93A as well. See *Fields* v. *Othon,* 313 Mass. 115, 118 (1943).

6. The final decree may be modified as provided in the fourth numbered section of this opinion, shall be modified as provided in the fifth numbered section of this opinion and as modified is affirmed.

*So ordered.*